STATE OF DELAWARE, Plaintiff, v. JOHN J. HALKO, JR., Defendant.

*(September 5, 1963.)*

LYNCH, J., sitting.

*W. Laird Stabler, Jr.,* Deputy Attorney-General, for the State of Delaware.

*Frederick Knecht, Jr.,* (of Knecht and Conte) for Defendant.

Superior Court for New Castle County, Nos. 637, 639, Criminal Actions, 1960.

LYNCH, Judge.

John J. Halko, Jr. was convicted in this Court on May 13, 1963, on charges of operating a motor vehicle while under the influence of intoxicating liquor and operating a motor vehicle while his license was revoked. On Friday, May 17, 1963, he filed a motion for a new trial or judgment of acquittal, assigning 6 reasons in support of his motion. Later he filed a "Supplement" to his previously filed motion on May 24, 1963, accompanied by an affidavit, made by defendant on May 23, 1963, referring to newspaper articles appearing in the local papers on

May 7, 8, 9, 10 and 11, 1963, concerning defendant and the then trial. The news articles were published during the progress of the trial. The 3rd ground of the motion, as filed on May 17, 1963, assigned as a reason for the granting of a new trial—

"The failure of the Court to instruct the jury not to read newspaper articles during the pendency of the trial. The local papers carried an article about the trial each day for the length of the trial, the reading of which by the jury the defendant feels would have been prejudicial to him since each one of the articles pointed out the fact that he had previously been convicted of the charges which were the subject matter of the trial."

It may be the filing of the defendant's affidavit was intended to bring to the Court's attention the newspaper articles referred to in the motion for a new trial and so did not broaden the matters complained of as error in this 3rd ground. Hence, I will disregard the delay in its having been filed, notwithstanding it was not filed within the time fixed by the Rules.

Rule 33(c), Criminal Rules of Procedure* of this Court, *Del. C.*, provides that:

"* * *, a motion for a new trial shall be served not later than ten days after the entry of the verdict, accompanied by a brief and affidavits, if any. * * *".

It will be observed, on comparison with Rule 33, Federal Rules of Criminal Procedure, that our Rule differs in several respects, but primarily in two important aspects. *First:* The Federal Rule requires that the "motion for a new trial * * * shall be made within 5 days after ver-

---

*Under the reasoning of *U. S. v. Smith*, post, it is questionable if a Motion filed without the "brief and affidavits" must be considered.

dict * * * or within such further time as the court may fix during the 5-day period". Our Rule 33 provides the "motion for a new trial shall be served not later than ten days after the entry of the verdict, accompanied by a brief and affidavits, if any. * * *" No provision is made in our Rule for extending the time within which a motion for a new trial may be filed.

*Secondly:* The Federal Rule makes no reference to filing of "a brief" and/or "affidavits", as does our Rule 33.

The Federal Courts, *Marion v. United States,* 171 F. 2d 185 (C.C.A. 9, 1949) ; *United States v. Stirone,* 168 F. Supp. 490, 502 (W.D.Pa., 1957) and *United States v. Kramer,* 172 F.Supp. 288 (W.D.Pa., 1959) ; see also *United States v. Smith,* 331 U.S. 469, 473, 67 S.Ct. 1330, 1332, 91 L.Ed. 1610 (1947) rehearing denied 332 U.S. 784, 68 S.Ct. 28, 92 L.Ed. 368, have ruled that matters set out in a motion filed after expiration of the 5 days, set forth in the Rule, or in an amended or supplemental motion for a new trial, may not be considered, since the time provision for the filing of a motion for a new trial (otherwise than for newly discovered evidence) is jurisdictional and mandatory, see *United States v. Smith,* supra.

■ ■ I rule that Rule 33(c) should be similarly construed, and thus I hold that the matters set forth in the Supplemental Motion are not before me for determination and must be disregarded.

■ Defendant's motion, as filed on May 17, 1963, was supported by an affidavit in which he made reference to matters determined by the Court's decision and opinion, filed December 28, 1962, and reported in Del., 188 A.2d 100, determining a Motion to Suppress Evidence. Grounds 4 and 5 of the Motion incorporate the same points and they are made reasons for the grant of the new trial. As

was emphasized in the reported opinion, such points were decided adversely to defendant on his previous appeal. The Supreme Court's determination thereby became "the law of the case"—Del., 175 A.2d 42 (Sup.Ct.1961).

Such rulings were binding on this Court and the defendant at the trial which took place in May of 1963. To the extent the prior opinion of the Supreme Court may not have been determinative as to any and all points raised by Reasons No. 4 and 5, this Court again overrules them as in no wise erroneous.

I will follow the order of priority set forth in the defendant's brief and rule on the reasons in that same order.

The first reason assigned was—It Was Improper for the Court to Refuse Defense Counsel the Right to Cross-Examine Police Officers from Accident Reports.

During the course of the trial the State called two police officers as witnesses. They *testified without notes;* they gave their recollection on May 7, 1963 of events which took place on October 18, 1959. When cross-examination of these officers began, a question arose as to the propriety of defendant's counsel cross-examining them from two accident reports they had prepared in October, 1959, either on the day of the defendant's arrest or shortly thereafter, and as such reports reflected what took place on October 18, 1959. The Court ruled that defense counsel could not cross-examine these witnesses from such accident reports although defense counsel told the Court that the times written in the reports by the officers would show prior statements, as to time, inconsistent with their testimony at the trial. Defense counsel contends he did not desire or endeavor to put the reports into evidence, and says he informed the Court that he had no intention to try to do so.

Title 21, *Del. C.* § 318, requires police officers and sheriffs to file with the State Highway Department "reports" of accidents on State Highways, disclosing "the cause, conditions then existing, and the persons and vehicles involved."

It is to be noted—and emphasized—that such reports are not those of persons involved in the accident; the "forms for accident reports" are supplied "to police and sheriff's offices." There is no express or implied direction in the statute, calling for the reports to be made by operators of the motor vehicles involved in "a highway accident".

The cited section further provides:

"* * * *Such reports* shall be without prejudice, shall be for the information of the State Highway Department and *shall not be open to public inspection.*" (Emphasis supplied)

The cited section also provides:

"* * * The fact that such reports have been so made shall be admissible in evidence solely to prove a compliance with this section, but *no such report or any part thereof or statement contained therein shall be admissible in evidence for any other purpose in any trial, civil or criminal, arising out of such accident.*" (Emphasis supplied)

The Court's ruling, refusing defendant the right to cross-examine the witnesses, based on such a report, was based on the Court's then comprehension of the legislative intent of the statute. No cases were cited by counsel, either by the State or on behalf of defendant, stating their respective positions.

Defendant argues that there is no specific mention in the statute prohibiting their use for purposes of cross-

examination; further that these reports are frequently used by testifying police officers to refresh their recollection in both civil and criminal trials; and that had this cross-examination been permitted, it would have been demonstrated graphically that the officers changed their testimony as to the time of the accidents referred to in the testimony in this criminal case. It would seem sufficient to say that defendant was not charged with having caused any motor vehicle accident; he was charged with having operated a motor vehicle while under the influence of intoxicants and while his license was suspended. Hence, the cross-examination appears to have been on an immaterial point and whether the Court was right or wrong in its ruling, any error would not be prejudicial and cause for reversal. See generally, 5A C.J.S. Appeal and Error § 1716c, pages 898-902; 98 C.J.S. Witnesses §§ 376, 377, 378, pages 130-134 and 58 Am.Jur. Witnesses §§ 623-627. Of course, this would not apply if there is a right in the defendant to use "any part" of the report for impeachment purposes; hence, it is of importance to the defendant that the Court determine what, if any, use defendant can make of an accident report filed pursuant to 21 *Del. C.* § 318. Defendant insists that the Court's ruling deprived the defense of the opportunity to discredit the testimony of the officers by showing prior inconsistent statements, through the use of statements made by the officers themselves contemporaneous with the events in question and appearing in the reports. This clearly demonstrates to me that defendant's counsel wanted to use "a part" of the report, and this necessitates a careful examination of the statute to ascertain what, if any, right the defendant had to make use of the reports, or "any part thereof", in light of the clearly expressed prohibition that "no such report or any part thereof or statement contained there-

in shall be admissible in evidence for any other purpose in any trial, civil or criminal, arising out of such accident."

The cited section was Section 16 of the Uniform Act Regulating Traffic on Highways; it was adopted April 18, 1929 as Section 108 of Volume 36 Laws of Delaware, Ch. 10. It became ¶5647, 1935 Revised Code, Chap. 165, § 109, and when the 1953 Code was prepared and adopted by the General Assembly the original statutory language was incorporated in the Code and become Title 21 *Del. C.* § 318.

The scope and purpose of legislation requiring reports to a State, and the admissibility of information appearing in such reports is considered in Vol. 8, Wigmore on Evidence (McNaughton's Ed.), § 2374, et seq. and particularly in § 2377, where at page 786 this type of report is considered. It is stated (p. 780):

"The policy underlying the principle * * * is that where the Government needs information for the conduct of its functions and the persons possessing the information need the encouragement of anonymity in order to be induced to make full disclosure, the protection of a privilege will be accorded."

Many cases are cited and discussed in footnote 8 on page 786. These cases reach varying results; it is not necessary now to examine them. Reference will be made to some of them—and more—at a later point.

The statute has not been construed in any reported decision. In *Skinner et al. v. Herzog*, C.A. 11, 1960, Judge Christie, in an unreported Memorandum Decision, denied a motion, filed by the Attorney General, to quash a subpoena duces tecum, issued by a defendant in an automobile accident case to recover civil damages, directed to the in-

vestigating State Trooper ordering him to appear and produce his records and reports concerning the accident which formed the basis for the suit.

The Attorney General contended the report of the accident as made by the State Trooper was privileged in light of Title 21 *Del. C.* §§ 318, ·2913 and 4151 and so should not be produced.

The concluding paragraph of Judge Christie's unreported opinion reads:

"The motion to quash the subpoenas is denied. Nothing contained herein is to be construed as preventing the State from seeking a protective order under Civil Rule 30 (b) where a subpoena duces tecum imposes an unreasonable burden upon the police or hampers a criminal investigation or where special situations indicate that the State should not be required to comply with the subpoena."

Defendant in the case had argued:

"* * * that the privilege provided for by statute is meant to apply only to the report of the driver involved in the accident and not [meant] to [apply to] any other notes of the police investigation.

"In many cases a trial takes place at least a year after the accident. Sometimes the trial is delayed for three years or more. Some police officers are called upon to investigate several accidents per week. Even those officers who recall a specific accident cannot remember the all-important details of their investigations. Since much information about an accident can be found only in the police report, a ruling that the entire report is privileged would seriously hamper the Court's quest for the true facts of an accident."

In reaching his conclusion and determination Judge Christie observed:

"Before this case came up it had been the custom for a police officer to use the official accident reports to refresh his recollection on the witness stand when testifying in both civil and criminal cases. The accident reports were not admitted in evidence but information contained in such report was readily available to the officer when he was testifying and much of the contents of the report found its way into evidence unless it was otherwise inadmissible.

"The State now takes the position that under the statutes the accident reports may be used by a police officer to refresh his recollection only in advance of trial. Since the argument in this case, police officers have been endeavoring to become familiar with the accident report before they are called as witnesses and they do not take the report with them to the witness stand.

"This system is fraught with practical difficulties. If the accident report may be used to refresh the officer's recollection, it should be used in the most efficient and fair manner. On the other hand if the law forbids the use of such report, the imposition of a memory test between the report and the testimony does not cure any improper use thereof."

At a later point Judge Christie noted:

"It has been suggested * * * that the statutory privilege attaching to the operator's reports should be further limited to reports made by operators directly to the Highway Department as required by law and that oral statements made by operators to police officers and written down by him upon a police form are not privileged even if a copy thereof is forwarded to the Highway De-

partment. If this theory were adopted the statutory privilege would all but disappear. That issue, however, is not before me at this time."

Judge Christie, in concluding his Memorandum Decision, said:

"Since much of the information contained in an accident report is not privileged under the statute, *a police officer should bring the report to trial so that he may refresh his recollection as to admissible information contained therein. The officer may be required by subpoena duces tecum to bring the report and other pertinent matter with him when his deposition is to be taken for the purpose of refreshing his recollection."* (Emphasis supplied)

I join completely in most of Judge Christie's concluding statements; he made no ruling other than as set forth in the preceding paragraph; he held only that the officer could use the report for the stated purpose. Judge Christie declined to pass on what, if any, "statutory privilege" there was to the reports called for by the statute under which they were made; it is clear his ruling is very limited. It does not bear relation to or throw any light on the point raised by counsel for defense in the case before me, hence I am required to go further and decide if the reports "or any part thereof" may be used for impeachment purposes.

At page 822, supra, reference has been made to Wigmore's consideration of the confidential nature of a report, required by statute, and where it is stated in the statute that no such report or any part thereof shall be admissible in evidence for any purpose, except as provided in the statute.

An annotation in 165 A.L.R. 1302, 1306, states that such legislation is upheld as valid, except in the "instances where particular statutes have been held to offend specific constitutional provisions. * * *."

Many cases are cited and discussed in support of such a principle. It is not necessary that I proceed to demonstrate the power of the Delaware General Assembly to enact such legislation. Many cases can be cited sustaining such power. See *State v. Fountain,* 6 Penn. 520, 69 A. 926 (Gen.Sess., 1908) ; *State ex rel. Morford Atty-Gen. v. Emerson,* et al., 1 Terry 233, 238 et seq., 8 A.2d 154, 156 (Super.Ct.1939) ; 1 Terry 328, 10 A.2d 515 (Super.Ct.1939) affirmed 1 Terry 496, 14 A.2d 378 (Sup. Ct.1940) and *State ex rel Atty.-Gen. James v. Schorr,* 6 Terry 18, 65 A.2d 810, 812 (Sup.Ct.1949), in which case it was specifically ruled:

"* * * the Legislature has an unlimited power to enact any laws that it may consider necessary, except where the National or State Constitutions have placed limitations upon it."

The Court had, in a preceding sentence in the opinion, stated:

"Our State Constitution, * * *, is not a grant of power but is a limitation upon the powers which the State inherently possesses. * * *"

See generally, 11 Am.Jur. Constitutional Law §§ 138-139; and 16 C.J.S. Constitutional Law § 17 and 82 C.J.S. Statutes § 326.

■ A careful examination of our present Constitution shows there are no limitations to be found therein which would affect the power of the General Assembly to have enacted what is now 21 *Del. C.* § 318. It is not argued in the case at bar that the statute making the re-

port "confidential" is unconstitutional, hence I rule that the General Assembly had full power to enact the statute, and no consideration will be given to any point bearing on the constitutionality of the cited statutory section.

The pertinent rules of construction of such a statute, as is here involved, are discussed in the annotation, 165 A.L.R. 1302, 1308-1311. I fully recognize and accept the fundamental principle of law that there is a general duty to procure all available testimony in the ascertainment of the truth in the solving of factual disputes, Wigmore on Evidence, Vol. 8, § 2192, page 70.

Courts are, however, just as amenable to legislative limitations as are citizens. Courts can only declare what is the law but they cannot legislate, see *Flait v. Mayor and Council of Wilmington*, 9 Terry 89, 92, 97 A.2d 545, 546 (Sup.Ct.1953).

I adopt as controlling the statement of law that if the basis of non-disclosure is a statute, the Courts are bound to look to the statute for the dimensions of the privilege of non-disclosure so created, 165 A.L.R. 1308, and where the statute, such as 21 *Del. C.* § 318, so clearly, specifically and unambiguously states the privilege in inclusive and sweeping language, there is no question of construction presented; the legislative pronouncement must be given full effect and the Courts, as well as litigants are bound by its provisions.

21 *Del. C.* § 318 is wholly unequivocal in forbidding disclosure of the contents of the reports required by its terms. I find nothing in Judge Christie's pronouncement in *Skinner et al. v. Herzog*, which is in conflict with my determination. He ruled, supra, page 823, that he was not passing on any question of privilege.

. [9] Some Courts, considering legislation of the character here involved, take to themselves the power to construe or limit the scope of such a statute on consideration of public policy. It is well settled that the public policy of a state is to be found in its constitution and statutes, and only in the absence of any constitutional or legislative declaration may it be determined from judicial decisions. 11 Am.Jur. Constitutional Law pages 813, 814; see *Matthews v. Breyton,* 6 Storey 222, 193 A.2d 83, 86 (Sup.Ct., 1963); *Casey v. Southern Corp.,* 26 Del. Ch. 447, 29 A.2d 174, 177 (Sup.Ct.1942); *Ringling v. Ringling Bros.-Barnum & Bailey Comb. Shows,* 29 Del.Ch. 318, 331, 49 A. 2d 603, 609 (Ct.Ch.1946); *Skillman v. Conner,* 8 W.W.Harr. 402, 406, 193 A. 563, 565 (Super.Ct.1937); *State v. Tobasso Homes,* 3 Terry 110, 116, 28 A.2d 248, 252 (Gen.Sess. 1942); and *Eisenman v. Seitz,* 26 Del.Ch. 185, 190, 25 A.2d 496, 498 (Ct.Ch.1942).

The specific point argued by defendant's counsel necessarily will result, if it is sustained, in a part of the report going into evidence, notwithstanding counsel's earnest assurances that he does not intend the report or a part to go into evidence; necessarily counsel will have to refer to the report for the time factor, as a basis of his question, and to permit this, I conclude would be in direct conflict with the prohibition of the statute. See *Henry v. Condit,* 152 Or. 348, 53 P.2d 722, 103 A.L.R. 131 (1936) and *Lowen v. Pates,* 219 Minn. 566, 18 N.W.2d 455, 456 (Minn.1945).

The Supreme Court of Arizona in *Hirsh v. Manley,* 81 Ariz. 94, 300 P.2d 588, 592 (1956) held that a report made to the State Highway Department could not be used to impeach the testimony of the investigating officer. In nearby Pennsylvania, *Rogers v. P. R. T.,* 13 Pa.Dist. & Co. R.2d 165 (1957) the Court reached the same result.

*Haddad v. Brown & Root, Inc.*, et al., 142 Tex. 624, 180 S.W.2d 339, decided by the Supreme Court of Texas in 1944, is said to support the right to use an accident report for impeachment purposes. The Supreme Court of Texas reversed the Texas Civil Court of Appeals, 175 S.W.2d 269, which had held use of the accident report for cross-examination purposes, in an effort to impeach an officer, was not permitted. The language of the statute appears in the report of the case in 175 S.W. 2d. The case really turned on a matter of Texas Court trial practice; this is evident, since notwithstanding the reversal on the point noted, the Supreme Court of Texas, 180 S.W.2d at 342, directed affirmance of the Trial Court which had entered judgment for the defendant. In a sense it seems to have held that whatever error may have been committed it was harmless error. The statute is different in several respects from 21 *Del. C.* § 318. The Texas statute required every person involved in an accident to make a report and provided that such reports were privileged communications, while the part of the Texas statute requiring police officers to make reports said nothing about such reports being privileged. See annotations 153 A.L.R. 174 and 69 A.L.R.2d 1148, 1171.

In concluding discussion of this first point I rule that it was entirely proper for the Court to refuse defense counsel the right to cross-examine the police officers from accident reports filed pursuant to 21 *Del. C.* § 318.

Defendant advances, as his second reason why a new trial should be granted, the Court's repeated references "to its own notes [of the trial] in the presence of the jury", together with Court's remarks in connection therewith; thus, the defendant contends this was in violation of the constitutional prohibition, Art. 4, § 19, Const. of Delaware, *Del. C.*, which reads:

"§ 9. Judges shall not charge juries with respect to matters of fact, but may state the questions of fact in issue and declare the law."

It is not contended that the Court gave any charge to the jury, with respect to matters of fact; counsel for defense notes only that the Court in the course of trial "stopped the testimony of the witnesses * * * for the purpose of referring to the Court's notes [of the trial] and then stating what those notes contained in the presence of the jury."

It is not claimed that any reference made by the Court to the notes or as to what appeared therein was factually untrue.

Some instances are given by defendant of the alleged erroneous conduct on the part of the Court. For instance, defendant notes that in the course of defense's cross-examination of a State's witness, the following appears:

"THE COURT: 'From my notes here, Mr. Stabler limited him to Mr. Halko's actions on the night at 1:42 A.M. to something like 2:14 A.M., from Maryland Avenue and Broom to Brookside Drive. Did you go beyond that?'

"MR. STABLER: 'I did not.'

"THE COURT: 'That is what I have in my notes.'" It later developed that the time factor which defendant was alluding to had reference to the taking of some pictures by the witness at a later time, and the Court permitted defense further cross-examination on this phase of the case.

Defendant next complained of the following episode:

"JOHN B. LIGHT (CROSS-EXAMINATION)

"BY MR. KNECHT:

"Q Does Mr. Halko give you any business whatsoever now?

"A No, he does not.

"MR. STABLER: I object. He testified that he worked for the 7-Up Bottling Company at the moment.

"THE COURT: Sustained. I have got your testimony as you opened with, Mr. Knecht,—

"MR. KNECHT: (Interrupting) Your Honor, I would like to make an objection for the record. Again, I don't care whether I make the objection before the jury or out of the jury's presence.

"THE COURT: Well, take them out again.

"(The jury here retired from the Court Room.)

"THE COURT: I just don't want any discrepancy between testimony, Mr. Knecht. I have this witness stating that he operated a Service Station at Maryland Avenue and Cedar Avenue, in Wilmington. He says Mr. Halko's car was brought in at the end of the week after Halko was arrested and 'I put it on the lift.'

"Now, I don't know whether he meant to say that, whether there was a misunderstanding of the question. He said 'I examined the under portion of Halko's car.'

"Now, on this redirect, he says the car was on the lift when he came up.

"Now, I want to find out what is what; that is all, because this may be a factor and it may not be. I don't know.

"MR. KNECHT: Well, of course, we would have no objection if your Honor wished to ask the witness a

question. However, I respectfully object to your Honor referring to his notes, because that would be your Honor telling the jury your Honor's recollection of the witness' testimony.

"THE COURT: I have a distinct recollection, and that was the reason I had to go back to my notes, to see whether I had correctly written it out.

"MR. KNECHT: Well, I would think that, if your Honor would read your notes, and then ask any questions of the witness, that might clear up any questions in your Honor's mind. Then your Honor would not be making any comments from your notes.

"THE COURT: I just want to find out if I understand what this witness said on direct examination. I have got him saying that he put the Halko car on the lift, and then he said, at the end, he said that the Halko car was on the lift when he came in.

"MR. KNECHT: Well, I would respectfully suggest that this could be done by your Honor asking the witness as to who put the car on the lift.

"THE COURT: Well, all right, I will follow your suggestion, * * *

"I will not comment upon the evidence and I have no desire and I have no disposition to comment on the evidence.

"MR. KNECHT: I don't want the jury to get the feeling that you are affirming your notes.

"MR. STABLER: I will leave it between Mr. Knecht and the Court. I would certainly not make a point on rebuttal as to whether he put the car on the lift or as to whether he came along later; and I think that, in a case this long and of this magnitude, it didn't have anything to do with the case itself.

"MR. KNECHT: Then, inasmuch as you are certain that you would not want to go into this thing further, I assume that you will not make any reference or comments about it?

"MR. STABLER: I don't see what comment I could make. I don't intend to comment on it in any respect.

"MR. KNECHT: Well, I mean, in summation?

"MR. STABLER: Of course, not.

"MR. KNECHT: Inasmuch as Mr. Stabler assures me that he will not comment on it in summation, that is the end of the matter.

"You are excused, Mr. Light.

"THE COURT: Now, Mr. Knecht, I want to bring out one thing clearly, so that you won't think that I am doing anything except to see to it that the testimony has been consistent, after you had qualified Mr. Light stating that he had a service station on Cedar Avenue, I have it, 'Examined under portion of Mr. Halko's car; I saw no damage; examination took 10 to 15 minutes; afterwards, examined the whole car. Saw no damage on the bottom'. Now, on your redirect, the witness said, 'I came in when Halko's car was being examined on the lift'.

"I was bringing it out for your protection, and certainly not with any other purpose in mind, * * *

"I don't propose to be sterile in a case. * * * If you don't want me to bring out any inconsistencies, I don't care to do so.

"Now, when he came out with this testimony that he came in when Halko's car was on the lift, I knew that previously he had stated something else. If you want me to sit here like a Sphinx, I will sit here like a Sphinx.

"MR. KNECHT: That is what I want, your Honor.

"THE COURT: All right."

Counsel for defense cites McCormick on Evidence at § 8 on page 13—which discusses questions put to witnesses by Trial Judges. There were no questions put to witnesses by the Court, although counsel for defense says the Court should have asked questions rather than to have referred to his notes of trial to show inconsistencies in evidence, despite McCormick's stating otherwise.

Another occasion when the Court referred to its notes, arose in connection with the identification of an empty wine bottle, allegedly found in defendant's car the night he was arrested. There was some difficulty by the State as to proper identification of the bottles, followed up by defense counsel making this motion:

"MR. KNECHT: I would now like to move that the Court declare that the bottle shall be removed and that the jury be instructed that the State has not established the chain of evidence necessary for the use of this bottle, and for the consideration of it by the jury. I would further request your Honor to so instruct the jury in that regard. That is my motion.

"MR. STABLER: Your Honor, I have no opposition to the motion and take no stand on it.

"THE COURT: Ladies and Gentlemen of the Jury: In the light of Mr. Knecht's motion, and of the position of the State, I direct that you, as far as humanly possible, erase from your minds anything and everything that has had to do with this alleged bottle produced yesterday by Mr. Stabler. It is not an issue in the case and it is not to be considered as having been properly identified, and I direct that it be removed from the Court Room.

"Does that satisfy you, now, Mr. Knecht?

"MR. KNECHT: Yes, sir."

The trial consumed approximately six days. After a number of episodes, such as have been set forth, the following transpired, while Mr. Knecht was examining a witness. It is stated in full, so that there will be complete and detailed understanding of this asserted reason for a new trial and the ultimate Court's ruling thereon.

"BY MR. KNECHT:

"Q Mr. Bullen, I show you Defendant's Exhibit No. 3, which is a picture of the right front of Mr. Halko's car (handing same to the witness). Now, based upon your expereince of 23 years in the automobile repair business, I would like you to give me your opinion as to whether or not there would be more damage to the front of Mr. Halko's car than appears on that photograph if his car hit another car in the rear end at a speed from 35 to 40 miles an hour?

"MR. STABLER: Objection. That is not the testimony in the record, your Honor.

"THE COURT: I didn't think it was.

"MR. STABLER: And, not only that, but I fully concede that Mr. Bullen has been working at this trade for 23 years and I am sure that he knows how to do body work. But, as far as him knowing what particular kind of accident causes what particular kind of damage, I don't think that he can do that.

"MR. KNECHT: I would like to respectfully except in the record to your Honor's comment on what your Honor's recollection is as to speed.

"THE COURT: All right. Take the jury out.

"(The jury here retired from the Court Room.)

"THE COURT: Now, Mr. Knecht, let us, you and I, get ourselves in complete understanding.

"MR. KNECHT: Fine.

"THE COURT: Because it will help a great deal from this point on. If, at this point, and up to this point, you think that I have commented improperly upon any point of evidence, in contravention of the Constitutional inhibition, I want you now to make a motion for a mistrial, or for the withdrawal of a juror, so that we can get this aired completely. There have been many implications of that sort on several occasions, and I don't propose to have this question go up, if it does, with the matter not clearly and definitely clarified.

"MR. KNECHT: I would not be in a position to make such a motion until I had an opportunity to confer with my client.

"THE COURT: Well, you confer with your client and let us get it done. I am losing patience with these implications. If I have erred up to this point, let us stop it now and let us start it afresh.

"MR. KNECHT: All right.

\*　　　\*　　　\*　　　\*　　　\*　　　\*

"MR. KNECHT: My client advises me that he does not wish me to request your Honor for a mistrial.

"THE COURT: Now, I said Monday and I have said it again this morning, I don't sit here in a sterile manner. I have consulted what I think is our leading trial Judge. As I understand from looking at the books and from my consultation with [him], it is the right, in fact, the duty—I think [this Judge] said in so many words—if I don't comprehend something, I have got to

clarify it, on the basis that the jury may be misconceiving something; and I will point here in my notes, and, if you have any doubt, I will get Mr. Brown to do likewise.

"Mr. Bullen's testimony was like this: He saw Mr. Halko coming down Boxwood Road. Mr. Halko appeared to be coming about 35 miles an hour; and the witness saw that Mr. Halko was not going to stop, and he drove over in the gas station and was hit.

"If you have any doubt, let us get it clarified, because there is no testimony that Mr. Halko struck Mr. Bullen's car going 30 to 35 miles an hour.

"MR. STABLER: Whether it was going 35 or 20 miles an hour, my objection to the question was the fact that the testimony of Mr. Bullen was that he was moving when he was hit. So, therefore, it was an unfair question to ask this gentleman to say. Wouldn't this cause more damage if somebody was hit by somebody going 30 to 35?

"THE COURT: It is an argumentative question, as the first basis of objection, and I know that, as he proceeded to complete it, I had assumed that that was going to be a basis for your objection.

"MR. STABLER: It is not a proper citation of the record. That is my objection.

"MR. KNECHT: I can solve this whole thing by withdrawing the question.

"THE COURT: All right. Let the record show that, after the conference in the absence of the jury, Mr. Knecht withdrew the question.

"Bring in the jury."

From the foregoing analysis of the episodes noted by defendant's counsel, it is crystal clear that the Court did not on any occasion make any comment on any evidence as "comment" has been defined by our Courts. It was ruled in *State v. Carey*, 6 W.W.Harr. 521, 535, 178 A. 877, 883 (Ct.O. & T.1935):

"A comment or charge on the facts is some expression by the court directly or indirectly conveying to the jury the court's estimation of the truth, falsity or weight of "testimony in relation to a matter at issue. * * *" See *MacFeat v. Philadelphia W. & B. R. R. Co.*, 6 Penn. 513, 516, 69 A. 744, 746 (Sup.Ct.1908); *Canadian Industrial Alcohol Co. v. Nelson*, 8 W.W.Harr. 26, 188 A. 39, 55 (Sup.Ct.1936) and *Buckley v. R. H. Johnson & Co.*, 2 Terry 546, 45 A.2d 392 (Super.Ct.1942). See also Appeal and Error, §§ 210, 211, 212; 23 C.J.S. Criminal Law § 993, pages 1024—1030; 24 C.J.S. Criminal Law § 1440. In 23 C.J.S. at page 1024 it is stated:

"* * * it is not an improper comment on the evidence for the judge to explain his ruling on a matter of law, and he may refer to testimony and state its legal effect, in deciding a point raised during the trial. So, also, the judge may state that a question has already been answered or repeat correctly the answer of a witness, on the repetition of the question by counsel, * * *." And in 23 C.J.S. at page 1029 it is stated:

"* * * it is held that it is not improper for the judge, during discussion of the admissibility of evidence * * *, or in explaining a ruling or other matters developing in the progress of the trial, to make a fair and correct statement of what evidence is before the jury, as for example, to state that there is or is not testimony to a certain effect, * * *."

And see Anderson's Ed., Wharton Crim. Law & Procedure, Vol. 5, § 2027.

The defendant's attorney had no adequate basis for contending the Court's efforts to correctly state the evidence amounted to "comment" by the Court on the evidence. Assuming there could have been some basis for the contention, the defendant "waived" any error that the Court may have committed by not complying with the Court's request that he move for mistrial so that the entire question could be considered and clarified. Counsel must preserve alleged errors committed by the Court, by timely and sufficient objections and requests, *Rickards v. State,* 6 Terry 573, 578, 77 A.2d 199, 202 (Sup. Ct.1950), if he wishes to assert such matters as grounds for new trial. Defendant cannot gamble on his chances for a favorable verdict and, if disappointed, then seek to use the alleged error as grounds to obtain another trial. *State v. Robinson,* 238 S.C. 140, 119 S.E.2d 671, 676 (Sup. Ct.S.C.1961) and *Com. v. Kiefaber,* 197 Pa.Super. 298, 179 A.2d 262, 269 (Pa.Super.Ct.1962).

In all events, the Court's instructions to the jury made it very plain that it was the jury's province to determine the effect and weight to be given to the evidence in this case, without any regard to what was said by the Court or counsel in the course of trial. I rule there is no merit in this reason for granting defendant a new trial.

Defendant, as his third reason why a new trial should be ordered, contends and argues the Court committed error when it did not admonish the jury not to read newspaper articles or listen to radio broadcasts about the case while the trial was pending. The affidavit referred to supra at page 819 had attached to it eight newspaper articles which appeared in the local papers

during the progress of the trial. Defendant notes there was at least one such article each day of the trial and in some instances two—one in the morning paper and another in the evening paper. Both papers enjoy a wide and general circulation in New Castle County.

All eight of the newspaper articles mentioned above commented upon the daily progress of the trial and, says defendant's attorney, most damaging of all, mentioned the fact that the defendant had previously been convicted of the charges upon which he was now being tried, and one news article reported that the Supreme Court of Delaware had granted the defendant a new trial on "technical grounds".

Defendant points out the newspapers concerned are the only two daily papers in the county and suggests they are most likely brought into the home of every juror. These papers are also very probably read by the jurors each day and by their families and friends.

On the other hand there is no evidence that there were any radio broadcasts by local stations concerning this case while the trial was in progress, so we are concerned solely with the question of the newspaper articles.

Defense counsel contends that the law on this subject which supports his motion for a new trial reads as follows:

" 'Where the jurors are permitted to separate, they should be admonished *by the court* * * * not to read published accounts of the course of the trial.' 23A C.J.S. Criminal Law Sec. 1361, P. 960. (emphasis added)"
I do not believe this to be the law. Examination of the cases cited in support of the stated proposition shows, on analysis, that the issue arose in the course of trial and after counsel had asked the Court to note the alleged prejudicial publicity.

In *McHenry v. United States*, 51 App. D.C. 119, 276 F. 761 (1921) it is said the mere opportunity to see a newspaper article raises no presumption that it was seen; and see *People v. Agron*, 10 N.Y.2d 130, 142, 218 N.Y.S. 2d 625 (1961), cert. den. 368 U.S. 922, 82 S.Ct. 245, 7 L. Ed. 136 (1961), wherein it was indicated the appellant must show that some or all of the jurors came in contact with any alleged prejudicial material. In *Ferrari v. United States*, 244 F.2d 132, at page 139 (9th Cir. 1957), cert. den. *Darneille v. U.S.*, 355 U.S. 873, 78 S.Ct. 125, 2 L.Ed. 78 (1957), the Court says:

"In any event, in the absence of proof that any member of the jury saw or heard the stories mentioned, [newspaper articles] failure to tell the jurors not to read newspapers or listen to the radio is not reversible error."

In *United States v. Griffin*, 176 F.2d 727 (3dCir. 1949), the Court did not specifically instruct the jury not to read the newspapers or listen to the radio. The language appearing 176 F.2d at page 731 is particularly applicable to the case *sub judice:*

"There is no proof that the jury or any member of it saw or heard the stories mentioned, but assuming that this did occur, there is not the slightest reason for inferring that real harm resulted to appellant thereby. *United States v. Katz*, 3 Cir., 173 F.2d 116. Complaint is made that the Court in its above admonition did not directly tell the jury not to read the newspapers or listen to the radio. In our judgment, the Court was entitled to consider as he did, that he was dealing with an intelligent American jury of honesty and integrity. He told its members plainly that they were to decide the case only on the evidence they heard in the court room, not what they 'might happen to hear or read elsewhere'. * * *. As Mr. Justice Holmes said in *Holt v. United States*, 218

U.S. 245, at page 251, 31 S.Ct. 2, at page 6, 54 L.Ed. 1021, 20 Ann.Cas. 1138; 'If the mere opportunity for prejudice or corruption is to raise a presumption that they. exist, it will be hard to maintain jury trial under the conditions of the present day.' "

 It is recognized that a Court must constantly be vigilant that there is no prejudice to or impairment of an accused's constitutional right to a fair trial, see *U. S. ex rel. Brown v. Smith*, 200 F.Supp. 885, 933 (U.S.Dist. Ct.Vt.1962), reversed on other grounds, 306 F.2d 596 (C. C.A.2) and *Coppedge v. U.S.*, 106 U.S.App.D.C. 275, 272 F.2d 504, 506 (1959).

 This duty is to a great extent to be shared and assumed by counsel for the accused; he cannot expect the Trial Judge to pick up any and all acts that can affect his client's constitutional rights to a fair trial, see *Marshall v. U. S.*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d. 1250 (1959) and *Coppedge v. U. S.*, 106 U.S.App.D.C. 275, 272 F.2d 504, 506 (1959). In both of these cases the publicity given to criminal trials was quite vicious and justified the rulings of the Courts. Newspapers tend to reach out for "sensationalism"—regardless of the consequences to an accused and his constitutional rights—and when this becomes apparent and is prejudicial a Court must act to protect such constitutional rights of the accused. In the cited cases, however, defense counsel raised the issue while the trials were in progress; this is not true here.

If th issue is not raised during the progress of the trial, defendant and its counsel cannot expect the matter to end up to his advantage. It is always required that counsel raise a question of law affecting his client's rights, during and in the course of trial, if he intends to assert error, either on the motion for a new trial or by an appeal, see Rickards case, supra, p. 830.

The Court in this case gave the same type of instructions and admonitions to the jury as had been given for many years. If counsel for the defense wanted additional or other instructions or admonitions to be given to the jury he was free to request the Court to do so. He did not choose to do so. Nothing was brought to the Court's attention before or in the progress of the trial to justify the Court now granting a new trial, since the Court is presently of opinion that nothing was published about defendant's trial, as it was in progress, that could or did affect any constitutional rights of the defendant.

It is not to be forgotten that the jurors had received a copy of "A Handbook for Petit Jurors" (see affidavit of Elizabeth O. Richeson, Chief Deputy Prothonotary) before starting their service as jurors. They were specifically instructed therein not to read about a case in the newspapers and to avoid radio and television broadcasts. which might mention a case. The presumption is just as great that the jurors read this important message upon commencing their service as jurors, and heeded it, as any presumption that they read the newspaper articles; in question, in violation of the admonition. *Finley v. U. S.,* 271 F.2d 777, 780 (C.C.A.5, 1960) and see *Nail v. State,* 231 Ark. 70, 328 S.W.2d 836.

We have had one Delaware case which has treated the subject of jurors reading newspaper accounts of a trial. The case is *State v. Cole,* 1 W.W.Harr. 279, 114 A. 201 (Gen.Sess.1921). Defense counsel during the progress of the trial called to the Court's attention a newspaper article appearing about the trial of the case—while the trial was in progress. The Court, in turn, instructed the jury, 1 W.W.Harr. 279, 285, 114 A. 201, 203, in that case that they should disregard it.

After conviction the defendant noted the news article as a ground for a new trial. In denying defendant's motion for a new trial the Court said, 1 W.W.Harr. at 286, 114 A. at page 204:

"It [has not been] shown that any of the jurors had seen, read or heard the article, but counsel insisted that the article being in a newspaper of general circulation throughout the county, it must have come to the knowledge of one or more of the jury and prejudiced the defendant's case."

The Court, in effect and substance, determined the question presented here and held that under the facts stated a new trial should not be granted.

From the above language of our Court it is clear that a defendant must do more than sit back and wait to see what the verdict is before calling the news articles to the Court's attention.

Assuming that there is a presumption that the jurors read some or all of the articles and defendant did not waive his right to allege this as a ground for a new trial by failure to act during the trial, it must be shown that defendant was prejudiced by these articles. I am persuaded by language of the Court in *State v. McLaughlin*, 250 Iowa 435, 94 N.W.2d 303 (S.Ct.1959), where at page 310 it is stated:

"We think a rule which assumes as a matter of law that the mere reading or listening to newspaper or television or radio broadcasts of accounts of the trial is prejudicial misconduct of the jury goes too far, and we decline to follow it. * * * We hold the true rule to be that reading or listening to reports of or comments on a trial in progress, by the jurors, or some of them, is not necessarily prejudicial error. Something must appear

which leads to the conclusion that the jury was unfairly influenced by these extraneous matters; and in determining this, the trial court has a considerable, although not always final, discretion."

See also *Banner v. State*, 154 Tex.Cr. 153, 225 S.W.2d 975, 976 (Tex.Cr.Ct.App.1950) and *Trombley v. Langlois*, R.I., 163 A.2d 25 (1960).

▉ Lastly, defendant's counsel contends and argues that the defendant should have a new trial because the verdict of the jury was against the weight of the evidence. I find no merit in this reason.

Defendant's motion for a new trial or a judgment of acquittal is denied. Order may be presented on notice.