Mark COPPEDGE, Appellant,

v.

UNITED STATES of America, Appellee.

No. 14935.

United States Court of Appeals District of Columbia Circuit.

Argued June 8, 1959.

Decided June 23, 1959.

Mr. James C. McKay, Washington, D. C. (appointed by the District Court), with whom Mr. William H. Greer, Jr., Washington, D. C., was on the brief, for appellant.

Mr. Edward C. O'Connell, Asst. U. S. Atty., with whom Mr. Oliver Gasch, U. S.

Atty., and Mr. Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Before PRETTYMAN, Chief Judge, and WASHINGTON and DANAHER, Circuit Judges.

PRETTYMAN, Chief Judge.

Appellant Coppedge was indicted on sixteen counts, which involved breaking into a pharmacy and taking some property, including a check-writer and a batch of blank money orders, and thereafter filling in, forging, and cashing some of the money orders. Four other persons were charged in the same indictment; three of them pleaded guilty, and one was acquitted. Coppedge was convicted on ten counts. The point here on appeal revolves about the following circumstances. On the third day of the trial the Government called to the stand one of the four other defendants, one Clarence Thompkins (Tr. 258). In open court, the jury being present, Thompkins refused to take the stand and refused to be sworn. Under repeated questions and at least two mandatory directions from the court, he continued to refuse. The judge ascertained that the witness had a lawyer, and he directed that the lawyer be called. When the lawyer arrived, and again in open court in the presence of the jury, the trial judge directed Thompkins to be sworn and to take the stand. He again repeatedly refused, despite several peremptory directions of the court. The court directed that he be taken to a cell, in order that the court might deal with the matter after the day's adjournment. (Tr. 270–2.) At the end of the day, which was Thursday, December 11th, the trial was recessed until the following Monday. Then, the jury having withdrawn, counsel for Thompkins told the court that the reason Thompkins refused to take the stand was fear. "I sincerely and honestly believe that Clarence Thompkins is deathly afraid of Mark Coppedge. Mark Coppedge was involved in another incident involving his brother, Charles Thompkins, in which Charles

Thompkins was unmercifully beat, his teeth knocked out and he was pistol whipped. Clarence Thompkins saw that happen." (Tr. 336.) Upon inquiry by the court Thompkins himself refused to say anything. Counsel for the Government agreed with counsel for the witness. "I agree with Mr. Letterman. I think this man is in a state of great fear. I interviewed him four or five weeks ago in the cellblock in this building and he told me at that time that he was very much afraid of Mark Coppedge. He intimated that his life had been threatened." (Tr. 337–8.) The court inquired of the prosecutor whether there was a reasonable basis for this fear. The prosecutor replied that he thought there was. "I think that Mark Coppedge is a very vicious criminal." (Tr. 338.) The court then found Thompkins guilty of criminal contempt of court but suspended sentence.

On the following day, which was Friday, December 12th, both the *Washington Post* and the *Evening Star* published accounts of the trial, including both the events which occurred in the presence of the jury and those which occurred in the jury's absence. These accounts included the statements that Thompkins was deathly afraid of Coppedge and that Coppedge had once pistol-whipped Thompkins' brother, which statements, as we have noted, were made in the courtroom in the absence of the jury. One of the articles carried the statement of the prosecutor that he thought Coppedge was a vicious criminal. One of them said that police records showed Coppedge to be serving a prison term for assault with a deadly weapon on Charles Thompkins. It also quoted the trial judge as saying that it was clear that neither the police nor the District Attorney could guarantee protection for Thompkins, either in jail or out of jail.

On Monday, December 15th, when the trial resumed, counsel for Coppedge presented copies of the newspaper articles and moved for a mistrial. He requested that the court interrogate the jurors,

saying, "And if any of the jurors did happen to read this article, I am sure that that juror would not be able to fairly and impartially decide this case." The court said: "I want to say that I am going to deny the motion for mistrial. However, I think I am going to comply with the request of counsel to ask the jury whether they have read the articles." (Tr. 351.) After a short further colloquy the court said: "However, I do not want my submitting this inquiry to the jury to be taken as an indication that if any juror answers in the affirmative, that I am going to grant the motion, because I am going to deny the motion but I will state my reasons later." The court then asked the members of the jury whether any of them had read either of the articles. Four of the regular jurors and one of the alternate jurors raised their hands. Thereupon the following occurred:

"THE COURT: * * * Of course, you understand that these articles must not affect your decision and you must not consider them. When the time comes for you to bring in your verdict you will have to consider only the evidence introduced in court in the light, of course, of the instructions of the Court.

"Now, is there any one of you who has raised your hand who thinks that he cannot do that? Is there any one of you who thinks that he cannot ignore these articles and bring in a fair verdict on the evidence solely?

"(No response.)

"THE COURT: If any of you think that you cannot, please raise your hand.

"(No response.)

"THE COURT: Thank you, ladies and gentlemen.

"Nobody is raising his hand, so I think it is a fair and reasonable inference for the Court to draw that those jurors who have read these articles will not be influenced by them.

"You may retire to the jury room again for a few moments, if you please.

"(The jury withdrew from the courtroom.)"

(Tr. 352–3.) Counsel for Coppedge then said that if he were a juror and had read the articles he did not feel that he could impartially render a decision. The court responded that he was sure counsel could do so and that he (the court) could also do so.

The court then denied the motion for a mistrial, rendering an opinion on the point from the bench. The denial rested upon two grounds. The first was that the court cannot censor or control the press and cannot stop prejudicial articles from being printed. The second reason was that the jury would not be influenced by the articles: "It is only those who have but little contact with jury trials that seem to be obsessed with the notion that the jury is influenced by every zephyr, every little episode, every little incident that happens. That has not been my experience. My experience has been that the average jury confines itself strictly to the merits of the case and is not influenced by extraneous matters or by irrelevant remarks or comments made by anyone, not even counsel." (Tr. 358–9.) The court cited cases in the Second and Tenth Circuits and quoted a comment made by Judge Goodrich of the Third Circuit.

Prior to the foregoing occurrences the court had not admonished the jurors against reading newspaper articles or listening to broadcast accounts relating to the trial. At the beginning of the trial, when the jury was first sworn, the court admonished the members that they must not discuss the case with anyone and that they would please keep an open mind until the trial was finished. (Tr. 9–10.) The court did not mention newspapers or newspaper articles. The trial judge did not further admonish the jury at the end of the first day, or of the second day, or of the third day.

During the oral argument of this matter before this court we requested the United States Attorney to give us in writing references to any admonitions given the jury by the court. In response the United States refers us to pages 10, 84 and 103 of the printed Joint Appendix. Page 10 contains the matter which appears on pages 9 and 10 of the transcript, to which we have referred and which constitutes the remarks of the court to the jury at the time it was sworn. Page 84 of the Joint Appendix contains the matter appearing on pages 352 and 353 of the transcript, to which we have referred and which consists of the remarks to the jury by the court after the five jurors had said they had read the newspaper articles. Joint Appendix 103 contains remarks of the court to the jury at the end of the day on Monday, December 15th, which was after the events we have discussed had occurred. The court there said: " * * * and again let me ask you not to read any newspaper articles about it if there should be any." (Tr. 412.)

We are satisfied, from our examination of the record, from our verbal inquiry during oral argument, and from the written memorandum furnished us by the United States Attorney, that we have considered and discussed above all the admonitions given by the trial court in any wise related to the events we have discussed. The court made no reference to the matter in his final instructions to the jury. The nearest approach was the customary statement that the jury is the sole judge of the facts and that the jurors must determine the facts from the evidence.

 The judgment of conviction is reversed.

I. The court twice permitted the jury to separate overnight and again from Thursday to Monday. It did not admonish the jurors prior to any such separation against reading newspaper articles about the case. In Carter v. United States [1] we quoted from our opinion in Brown v. United States: [2]

> " * * * And in all criminal cases whenever jurors are permitted to separate, the court should invariably admonish them not to communicate with any person or allow any person to communicate with them on any subject connected with the trial, and not to read published accounts of the course of the trial."

We added, in Carter: "The language we then used, 'the court should invariably admonish them', imposed upon the trial courts a requirement." This was one of the points upon which the judgment of conviction in Carter was reversed. The present case is a vivid illustration of the necessity for the rule. Under modern conditions juries are customarily permitted to separate, even over weekends, and, unless there be exceptional circumstances, they should be permitted to do so. Of course newspapers carry articles about public trials of sensational interest, and of course those accounts may, and frequently do, carry statements of facts totally outside the evidence being produced in the courtroom. Our newspapers have complete rights to publish such accounts and such additional facts. But it is essential to a fair trial of a defendant that the jurors should not know the contents of, lest they take account of, such newspaper stories. In order to protect, so far as possible, this essential right of a defendant, we have required that trial courts call the attention of jurors specifically to the possibility of such newspaper accounts and to admonish jurors not to read them. This has been a rule for the past twenty years, or longer, and this is at least the third time we have emphasized it. What is said here applies with equal force to radio news broadcasts or telecasts.

II. The inquiry made of the jurors by the court concerning their reading of the newspaper articles was not adequate for

1. 102 U.S.App.D.C. 227, 231, 252 F.2d 608, 612 (1957).

2. 69 App.D.C. 96, 99 F.2d 131 (1938), certiorari denied 305 U.S. 562, 59 S.Ct. 97, 83 L.Ed. 354 (1938).

the protection of the defendant. The court knew which of the regular jurors had read the newspaper articles. No individual inquiry was addressed to these persons as to the possible influence of the articles upon each of them. Only a general and very brief inquiry was made of the jury as a whole. There was even then no admonition that jurors who had read the articles must not reveal their purport to the remaining jurors. It is too much to expect of human nature that a juror would volunteer, in open court, before his fellow jurors, that he would be influenced in his verdict by a newspaper story of the trial. Not only so, but had one or more of them said they would be so influenced, and especially if they had then explained why, the damage to the defendant would have been spread to the listening other jurors. In view of the nature of the articles the court should have made a careful, individual examination of each of the jurors involved, out of the presence of the remaining jurors, as to the possible effect of the articles.

We need not dwell at length upon the nature of the newspaper articles, already evident from the description we have given. They contained facts which should not have come to the knowledge of the jury. Had they been offered as evidence in court they would not have been admissible. Had they been told to the jurors verbally by outside parties, the admonition which the court gave the jury would have been violated, the jurors would have been punishable if they had not reported the incident, and, had they reported it, a mistrial would have been in order. These facts included the statement that Coppedge was serving a term in the penitentiary for a violent assault upon Thompkins' brother, the prosecutor's opinion that Coppedge was a vicious criminal, and the judge's opinion that Thompkins could not be protected from Coppedge, either in or out of jail. That these facts, which thus came to the attention of the jury, were injurious to the case of the defendant needs no demonstration.

III. In any event we are of opinion that it would have been impossible to have cured in the mind of any reasonable juror the damage done to the cause of Coppedge by the statements in the newspaper articles. The jury observed the dramatic scene in which a witness on two separate occasions refused to be sworn and refused to take the stand despite the repeated and peremptory directions of the court. They learned that the witness was in mortal terror of Coppedge, the defendant. They learned that Coppedge was a vicious criminal, already serving a prison term for violence. We doubt that any reasonable juror could erase from his mind this picture of the defendant, whom they were trying for offenses which did not involve physical violence.

We think the reasons assigned by the trial judge for denying a mistrial were not adequate. 1. The right of newspapers to print such articles was not the pertinent point. The point was the jurors' knowledge of the articles. The court may be unable to prevent the publication of such articles, but proper admonitions can prevent their contents from coming to the attention of the jurors. 2. The possible influence upon the jury of passing comments was not the point involved. This was not a case in which a juror merely read in a newspaper a factual account of what had transpired in the courtroom in his presence. These articles—properly enough from the newspaper's point of view—contained additional facts, facts which the jurors were not entitled to know about the defendant, and which were devastating to his cause.

Our position in this case is fully supported by the opinion of the Supreme Court in Marshall v. United States,[3] handed down a few days ago. There the Court, in the exercise of its supervisory powers, reversed a conviction which had been affirmed on appeal, the ground for

3. 79 S.Ct. 1171.

reversal being that seven jurors had seen newspaper articles containing inadmissible factual allegations damaging to the defendant's cause. In that case the trial judge questioned the jurors separately in chambers, and each declared his ability to decide on the evidence only. Such safeguards are absent from the case before us, as we have noted. Nevertheless the Supreme Court ordered a new trial.

Reversed.