**UNITED STATES of America,
Appellee,**

v.

**Vincent N. COLABELLA, Defendant-
Appellant.**

**No. 105, Docket 71–1661.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 16, 1971.

Decided Sept. 30, 1971.

---

Pierre N. Leval, New York City, for defendant-appellant.

Robert P. Walton, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, Peter F. Rient, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before KAUFMAN, ANDERSON and FEINBERG, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

This appeal from a judgment of conviction for violating the federal narcotics laws involves the "most priceless" safeguard "of individual liberty and of the dignity and worth of every man"— the right to a trial by an impartial jury. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

Vincent N. Colabella, charged with the illegal sale of heroin,[1] was convicted after a three-day jury trial before Judge Levet on evidence that clearly established his guilt. Ronald J. Rossi, the government's principal witness and, at the time of the alleged crimes, a Special Agent of that Bureau of Narcotics and Dangerous Drugs, testified that he had purchased heroin from the defendant on February 22, 1966, and the following March 20. Corroboration was clear from the testimony of other agents who observed the transactions.

The case for the defense consisted solely of Colabella's own testimony. He

---

1. The indictment charged defendant on two counts of violating 21 U.S.C. §§ 173–74 for selling illegally imported heroin and on two counts of violating 26 U.S.C. §§ 4701, 4703, 4704(a), 4771(a) and 7273 (a) for selling the same heroin not in the original stamped package.

claimed that he had never seen Agent Rossi until shortly before the trial and denied that any of the transactions testified to by the government witnesses ever occurred. He admitted, however, to prior convictions for selling narcotics, possessing narcotics, grand larceny and assault.

Colabella's sole ground for challenging his conviction on appeal is that the *voir dire* examination for selection of the jury so infected all the prospective jurors with wide-spread bias that he was deprived of his sixth amendment right to trial by an impartial jury. We do not agree and, for reasons set forth below, affirm the judgment of conviction. Because the facts are essential to the resolution of the issue, we will describe the *voir dire* examination in some detail.

Judge Levet, at the outset, asked the customary questions of the prospective jurors, such as whether they knew the attorneys or anyone connected with them or knew the defendant or anyone connected with a law enforcement agency. After explaining to the panel that the indictment against the defendant charged narcotics violations, he inquired whether any prospective juror had "any inherent determinations or attitudes with respect to either the use of drugs or with respect to the prosecution. * * * *" There was no response. At the request of defense counsel, Judge Levet then queried whether any prospective juror would have difficulty applying the presumption of innocence and at the same time instructed the panel that defendant was not required to testify in his own behalf.

After the district judge had questioned the first twelve prospective jurors, the defendant exercised two peremptory challenges. He exercised four more before a private detective, who admitted that his employment would affect his impartiality, was dismissed with the consent of both parties.

When the defense exercised its ninth peremptory challenge, a prospective juror named Erosa was called. He an-nounced in open court that he had "prejudged already" and promptly was excused without further questioning. Thereafter, one Mary Symmons was summoned to the jury box, and she too indicated that she had prejudged the case. She also was excused without further questioning. At this point, three jurors who had been previously questioned and temporarily seated in the box raised their hands. The judge called on each of the three individually, while commenting that "it is catching." The first stated that he too had prejudged. The judge excused him after stating that he had failed to reveal his prejudice during his earlier questioning. The other two were also excused after asserting a claim of bias. Thereupon, the judge addressed the entire panel of prospective jurors in the courtroom:

> Now, I want to ask you once more—I told you about the nature of the case and I asked about whether you had any —I want to remind you of this—I asked whether you had any prejudices one way or the other about narcotics, and now after I asked that question and nobody spoke up, now I have four people who said they are biased.

> But go ahead, we will get a jury. If necessary, we may have to send for more.

Thereafter, Judge Levet questioned the four replacements. When he reached Mr. Efthimiou, the following exchange occurred:

> Q. Are you affected by any questions I have asked? A. Well, to be perfectly honest with you, your Honor—

> Q. Well, I assume all questions will be answered perfectly honestly. Are you or are you not biased? A. I feel that—

> Q. I didn't ask you how you felt. Will you please answer yes or no? Are you biased? A. No, I am not, no.

> Q. You seem to have some doubt about it. Do you have any doubt

about it? A. Yes, sir, about the whole courtroom.

Despite this colloquy, defense counsel refused to consent to Mr. Efthimiou's dismissal. Accordingly, the judge, counsel, the defendant and Mr. Efthimiou withdrew to the robing room where Mr. Efthimiou told Judge Levet that he believed the judge had prejudged the case and that other jurors were of the same view. When Efthimiou commented on "the attitude in the courtroom" and "the other people being the same," the judge cut him off abruptly, stating that he was not capable of determining the attitudes of others. After returning to the courtroom, the government excused Mr. Efthimiou peremptorily.[2]

The juror who took Efthimiou's place also stated that she had prejudged the case and was excused with the consent of counsel. Following the exercise by the defendant of his last peremptory challenge, three more jurors announced that they were biased. The judge excused the first two without comment, but to the third, Mr. Diamond, he said: "You feel do you, you cannot render a fair verdict on this case, on a kind of case such as this? Answer me. Don't just nod." Mr. Diamond answered affirmatively and was excused.

When another juror, an employee of the Post Office Department, was called, he stated he was free of prejudice. The court, after hearing an objection by the defense for cause, called a luncheon recess.[3] After reconvening, the judge overruled the objection and then addressed the twelve jurors in the box:

> Now, I want to ask you one final question. Irrespective of whether I have inquired about this or not, is there any reason because of your past experience or your connections or anything you have heard this morning why you cannot decide this case fairly and impartially? I hear no response.

Therefore, Mr. Clerk, will you administer the oath to the 12 jurors in the box?

Two alternate jurors were then selected, and the jury was sworn without objection from the defendant.

Although there was no objection to swearing the jury, the defendant now claims that the circumstances of the *voir dire* indicated "a manifest danger that prejudice existed among the jurors" and that "the trial judge's conduct of the *voir dire* exposed the defendant to an unnecessary risk of trial by a biased jury." In particular, he asserts that the judge's rebuke of a Mr. Diamond, the last juror excused for bias, may have dissuaded previously or subsequently seated jurors from admitting prejudice. He therefore claims that his conviction should be reversed. We do not agree.

█ Although the failure to object below is not necessarily fatal to an appeal, this court will exercise its discretion to notice "plain error," see F.R. Crim.P. 52(b), only when there is a likely miscarriage of justice or the error seriously affected the fairness of the trial. United States v. Indiviglio, 352 F.2d 276, 280 (2d Cir. 1965) (*en banc*), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L. Ed.2d 663 (1966); Blier v. United States Lines Co., 286 F.2d 920 (2d Cir.), cert. denied, 368 U.S. 836, 82 S.Ct. 32, 7 L.Ed.2d 37 (1961). This is not such a case, however.

That a juror might not have been impartial is, indeed, a possibility. But, when we venture into speculation over thoughts or attitudes not manifest, there is always the chance that any jury empanelled to try a case may include an individual whose prejudices have not been revealed. We note that nothing has been called to our attention to indicate that in this case, any juror was in fact not impartial. Moreover, we cannot see

---

2. This was the only peremptory challenge the government exercised.

3. The juror was challenged for cause because his employment as a vehicle control officer with the Post Office involved disciplinary proceedings. Judge Levet reserved decision until after the recess.

what else the able trial judge could have done to be as certain as humans can that he had finally selected twelve unbiased jurors. In this connection we note his final invitation to all twelve after the luncheon recess for any comment, even at that late period in the selection process, which would reveal any prejudice or bias. That no juror responded to this query, which was sufficiently removed in time from the morning colloquy to give the jurors ample time for rational reflection, indicates clearly to us that the jurors believed they were devoid of prejudice.

Defendant relies primarily on two Supreme Court decisions—Irvin v. Dowd, *supra*, and Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956). Neither case is apposite.

We are not confronted with a case where a presumption of prejudice was created by the pervasive pre-trial publicity which existed in *Irvin*; nor, as in *Irvin*, did any juror express the view that defendant was guilty, but that he could exclude this pre-conception in reaching a verdict.[4] And the instant case falls far from *Remmer* where a juror was approached by an outsider, the juror reported the incident to the judge, the FBI investigated during the trial and where the juror related the entire incident to two other trial jurors, admitting to being under tremendous pressure.

■ Despite the absence of an objection to the jury, defendant now claims that Judge Levet, *sua sponte*, should have conducted "a searching inquiry to be certain that the contagion of prejudice had not spread to any of the impanelled jurors." The trial judge has broad discretion in conducting the *voir dire*. See Stephan v. Marlin Firearms Co., 353 F.2d 819, 822 (2d Cir.), cert. denied, 384 U.S. 959, 86 S.Ct. 1584, 16 L.Ed.2d 672 (1965); United States v. Dennis, 183 F.2d 201, 226–228 (2d Cir.), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L. Ed. 1137 (1951). In light of our conclusion that the circumstances of the *voir dire* did not raise a presumption of partiality, and since we conclude that Judge Levet was not required to conduct the further inquiry after having already conducted an exhaustive *voir dire* examination, we believe no error was committed. Moreover, in the circumstances of this case, it seems clear that the failure of trial counsel to object to the swearing of the jury indicated that he too believed that the jury as finally selected was not infected with prejudice and that the judge had done all required of him in selecting a fair jury. *Cf.* United States v. Kahaner, 317 F.2d 459, 482–483 (2d Cir.), cert. denied *sub nom.* Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963).

■ Having disposed of the case before us on the merits, we believe it might be of some aid to district judges, if we noted that there may be circumstances when it would be better practice for the judge to question each prospective juror out of the presence of other prospective jurors, but, of course, in the presence of counsel and the defendant. See Silverthorne v. United States, 400 F.2d 627 (9th Cir. 1968) (evidence of wide-spread community prejudice because of pre-trial publicity).[5] See also

---

4. Silverthorne v. United States, 400 F.2d 627 (9th Cir. 1968), which the defendant also cites, involved a situation nearly identical to *Irvin*. 43 out of the 55 jurors called to the box were excused. Every juror in the original panel of 65 admitted that they had been exposed to extensive pre-trial publicity. The court held that the *voir dire*, which consisted of general questions addressed to the panel at large, did not adequately dispel the probability of prejudice.

5. Section 3.4(a) of the Proposed Final Draft of the A.B.A. Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (December, 1967), provides:

   Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors.

Coppedge v. United States, 106 U.S. App.D.C. 275, 272 F.2d 504 (1959), cert. denied, 368 U.S. 855, 82 S.Ct. 92, 7 L. Ed.2d 52 (1961), where in reversing the conviction the Court said:

> It is too much to expect of human nature that a juror would volunteer, in open court, before his fellow jurors, that he would be influenced in his verdict by a newspaper story of the trial. No only so, but had one or more of them said they would be so influenced, and especially if they had then explained why, the damage to the defendant would have been spread to the listening other jurors. 272 F.2d at 508.

It is true, however, that the prejudice we are concerned with differs in kind from that in *Silverthorne* and *Coppedge*. The defendant argues that the prejudice which he alleges persisted in this case, emanated from the judge's comments indicating displeasure with those who were asserting they had prejudged the case. In such an instance, we believe it would be advisable for the judge, soon after there is an indication that a juror will claim he is biased (or that the judge is prejudiced), to proceed thereafter *in camera*, with counsel and the defendant present.[6] In his chambers or robing room the judge can conduct his examination freely, without the danger that any of his *own* comments will affect other jurors.[7]

■ We also recognize that in some circumstances it may be appropriate for the trial judge to reinstruct prospective jurors during the *voir dire* on the concept of prejudice which might be cause for disqualification. Such instruction

may prevent a chain reaction of illusory prejudice. In that event, however, the judge should take pains to be scrupulously impartial. In no event should he indicate any personal displeasure.

In making these suggestions, we are mindful of the need for effective reform to expedite jury selection. Certainly it is neither feasible nor desirable to examine every prospective juror individually out of the hearing of the panel. But, when there is any foundation for concern about juror partiality, partiality of the sort which, if expressed, might affect other prospective jurors, the demands of the "most priceless" safeguard of individual liberty—the right to trial by an impartial jury—justify the small expense of time required by the guidelines suggested above.

---

6. For example, if the judge directs a blanket question on prejudice to the venire (as several judges in the Southern District do), and a juror raises his hand indicating a response, we suggest that the judge should consider the wisdom of continuing his examination in the robing room.

7. In the Report of the Committee on the Operation of the Jury System on Voir Dire Procedures, approved at the October, 1970, session of the Judicial Conference of the United States, the Committee stated:

> The Committee wishes to call attention to the fact that trial judges, in their broad discretion over voir dire proceedings, may occasionally find it appropriate to examine jurors individually, out of the presence of other jurors, when questions relevant to the case may call for personal or potentially embarrassing responses.