**UNITED STATES of America,
Plaintiff,**

v.

**Patricia Campbell HEARST, Defendant.**

**Cr. No. 74–364–OJC.**

United States District Court,
N. D. California.

Feb. 2, 1976.

James L. Browning, Jr., U. S. Atty., F. Steele Langford, David P. Bancroft, Edward P. Davis, Jr., Asst. U. S. Attys., San Francisco, Cal., for the United States.

F. Lee Bailey, J. Albert Johnson, Boston, Mass., Thomas J. May, Brookline, Mass., for defendant.

## MEMORANDUM

OLIVER J. CARTER, Chief Judge.

Trial in the above captioned matter began on January 27, 1976, when the Court commenced conducting voir dire of prospective jurors, pursuant to Rule 24(a) of the Federal Rules of Criminal Procedure and Rule 19 of the Local Rules of Practice of this District. In view of the unusually pervasive publicity that has attended this case, it was stipulated by counsel representing both the Government and the defendant that each prospective juror should be examined individually to determine the extent of his or her knowledge of the case, the source of that knowledge, and the impact such knowledge might have on his or her impartiality. The Court, believing that this method of voir dire examination under the circumstances of this case is not only wise but also required by *Silverthorne v. United States,* 400 F.2d 627 (9th Cir. 1968), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971), accepted counsel's stipulation.

Upon completion of general questioning of the first panel of prospective jurors, the Court announced that it would retire to the adjoining courtroom so that it could conduct individual questioning of each juror outside the presence of the other members of the panel. The Court decided upon this course of action in order to encourage absolute frankness on the part of each juror questioned by preventing other members of the venire, soon to be questioned in like manner themselves, from hearing either the questions asked or the answers given by those questioned before them. Such a method of individual examination has found approval by the courts in a number of recent cases. *See e. g., United States v. Bryant,* 153 U.S.App.D.C. 72, 471 F.2d 1040 (1972); *United States v. Colabella,* 448 F.2d 1299 (2d Cir. 1971). *See also Coppedge v. United States,* 106 U.S.App.D.C. 275, 272 F.2d 504, 508 (1959), where the court said:

It is too much to expect of human nature that a juror would volunteer, in

open court, before his fellow jurors, that he would be influenced in his verdict by a newspaper story of the trial. Not only so, but had one or more of them said they would be so influenced, and especially if they had explained why, the damage to the defendant would have been spread to the listening other jurors.

■ Once inside the adjoining courtroom the Court entertained a motion by counsel for the defense to exclude members of the press and general public from further attendance at the voir dire proceedings. The argument was made that to permit the press and public to observe these sessions and report what was heard and seen therein would defeat the very purpose of segregating each prospective juror to be questioned from his or her fellow jurors. Counsel noted that as it was unlikely a jury could be selected, impaneled, and sequestered by the close of that day, those jurors not yet subjected to individual questioning would be bound to learn of what questions had been asked and how they had been answered through news reports and other means before they themselves could be examined by the Court. Counsel for the Government expressed his concurrence in this motion, and the Court, finding the reasoning therefor to be persuasive, ordered that the press and the general public be barred from attendance at these proceedings and that further individual examination of prospective jurors be conducted *in camera.*

Unfortunately, the suddenness with which this decision was necessarily rendered has left perhaps understandable confusion as to its underlying rationale among the representatives of the news media, who had anticipated unrestrained access to all courtroom proceedings in this case. The purpose of this Memorandum is to explain more fully the reasons for the Court's ruling on this matter.

■ The right to a fair trial by an impartial jury of one's peers, guaranteed by the Sixth Amendment to the Constitution, is a basic tenet of our criminal justice system. The Supreme Court in recent years has recognized that this precious right may be jeopardized where massive publicity before and during a criminal trial so infects the minds of the local populace as to make virtually impossible the selection of jurors who have not already formed a perhaps unalterable opinion as to the guilt or innocence of a given defendant. *See Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). This does not mean that a defendant whose criminal case is the object of even widespread public—and therefore news media—interest cannot under any circumstances obtain a fair trial; only that to achieve this goal in a highly publicized trial the presiding judge must exercise his or her discretion in striking a delicate balance between the rights guaranteed under the Sixth and First Amendments.

■ It is the sworn duty of this Court to ensure that a criminal defendant's constitutional rights are preserved during the course of his or her criminal prosecution. The news media, of course, have a professional duty to report the news. But unlike the court they are burdened by no *constitutional* obligation, although a moral one, to ensure that the defendant receives a fair trial. It is precisely because the Court recognizes the important duty of the press to investigate and report newsworthy events and the conflict this duty may have with the defendant's right to an impartial jury, that the Court has chosen to bar further access by the press and public to the voir dire proceedings.

As noted earlier, *Silverthorne v. United States* mandates that a judge presiding over a criminal trial attended by extensive pretrial publicity must provide for individual questioning of the jury panel where substantial numbers of that panel respond in *en masse* questioning that they possess some knowledge of the defendant's case. Not surprisingly, when the entire panel of jurors in the instant case were asked whether anyone among them had heard or read nothing

about the defendant or the criminal charges against her, not one panel member responded in the affirmative. For the reasons heretofore expressed, the Court therefore announced not only that the panel members be questioned individually, but also that they be questioned outside the presence of other prospective jurors.

As pointed out by defense counsel, the Court's purpose in isolating each juror from his or her fellow jurors in the individual questioning process would be ill-served were the remaining jurors to be exposed to news accounts of the proceedings from which they had been barred. Not only would the risk be increased that prospective jurors harboring no preconceived notions as to guilt or innocence of the defendant be implanted with the seed of prejudice by the statements of those questioned before them, but the difficult task of speaking one's mind concerning the highly sensitive and potentially embarrassing topic of personal bias would be made all the more difficult by the presence of a large audience of news reporters busily taking down every spoken word.

It has been suggested in a motion for leave to file a brief *amicus curiae* by representatives from the American Civil Liberties Union that less drastic measures than a total ban against public attendance at these proceedings might have been taken to achieve the same results. The Court must disagree. Permitting even a small pool of news reporters to attend these sessions would do little to lessen the inhibitory effect on a prospective juror's candor of the knowledge that what he or she says today will be memorialized on the front pages and flashed on the television screens almost immediately. Nor would such a limitation on admission of the press obviate the problem of prejudicial statements making their way to other prospective jurors, since even one member of the press could report his or her observations and destroy the value of secrecy in these proceedings.

■ A second suggestion posited for ameliorating the effects of a closed proceeding on the public's ability to receive information concerning this trial is for the Court to effect a sequestration of the entire venire. This suggestion must be summarily rejected. The Court is aware of no authority by which it could order sequestration of so large a number of individuals, the vast majority of whom will not be selected as jurors and *all* of whom have not yet been selected. In addition, the inordinate expense involved and the lack of available manpower to effectuate such an undertaking obviate the need for further discussion of this suggestion.

■ In the final analysis it may be said that this Court has always disfavored the "gag rule" approach to this or any other criminal trial, and the record will so indicate. The Court continues to believe that the right of the press freely to gather and report the news must be accommodated so far as is humanly possible, consistent with the Court's duty jealously to preserve a defendant's right to a fair trial by an impartial jury. In this regard it should be made abundantly clear that the Court's action with respect to banning attendance at these proceedings is in no way designed to shroud behind a permanent veil of secrecy the manner by which a jury in this case will eventually be chosen. A full and complete record of these proceedings is being made by the court reporter, copies of the transcripts of which will be made available at cost to the press or any member of the public after a jury has been selected and sequestered. Although the Court is mindful that "news" delayed may perhaps be "news" denied, it is a sacrifice that must be made if the defendant in this case is to be assured the opportunity for a fair trial.

■ It is an unquestioned principle in the federal criminal justice system that the conduct of jury voir dire is best left to the sound discretion of the trial judge. *See, e. g., United States v. Liddy*, 166

U.S.App.D.C. 95, 509 F.2d 428, 434–35 (1974); *United States v. Bryant,* 153 U.S. App.D.C. 72, 471 F.2d 1040, 1044 (1972); *United States v. Ploof,* 464 F.2d 116, 118 (2d Cir. 1972). In exercising its discretion here, this Court has considered the implications of denying—albeit temporarily—public access to proceedings in a trial, the prospect of which has stirred the public interest and imagination for nearly two years. But it is precisely because this interest has been kept at a fever pitch, particularly in recent weeks when pretrial publicity has pervaded every crevice of daily life, that the defendant's rights under the Sixth Amendment must take precedence—for the singular purpose of attempting to insure the impartiality of those who will be called to pass judgment upon her—over the news media's otherwise unassailable rights under the First Amendment.

In closing, it might be said that "it is your Constitution too" and that the press along with other segments of the public has the duty to support and defend the Constitution, not just the First Amendment, but all of it. However, the purpose of this Memorandum is not to lecture or chastise, but to state affirmatively that the right to a fair trial by all of the parties to this case is a continuing one, and that it is the duty of the Court to see that this is accomplished under the Constitution, all of it, not just one part of it.